UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  HON. CLAIRE R. KELLY, JUDGE

---

SEKO CUSTOMS BROKERAGE, INC.,                    :
                                                 :
                              Plaintiff,          :        Court No.  24-00097
                                                 :
                    v.                           :        **NON-CONFIDENTIAL**
                                                 :
UNITED STATES,                                   :
                              Defendant.          :
                                                 :

---

## ORDER

Upon reading defendant's motion to dismiss and opposition to plaintiff's application for a temporary restraining order and motion for a preliminary injunction; plaintiff's responses thereto, and upon consideration of other papers and proceedings had herein; it is hereby

ORDERED that defendant's motion be, and hereby is, granted; and it is further

ORDERED that plaintiff's application for a temporary restraining order and motion for a preliminary injunction is denied; and it is further

ORDERED that this action is dismissed.


                                        _____
                                             CLAIRE R. KELLY, JUDGE


Dated:          _____, 2024
                New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  HON. CLAIRE R. KELLY, JUDGE

| | | |
|---|---|---|
| SEKO CUSTOMS BROKERAGE, INC., | : | |
| | : | |
| Plaintiff, | : | Court No.  24-00097 |
| | : | |
| v. | : | **CONFIDENTIAL** |
| | : | |
| UNITED STATES, | : | |
| Defendant. | : | |
| | : | |

## DEFENDANT'S MOTION TO DISMISSS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of International Trade, defendant, the United States, respectfully requests that the Court dismiss this action for lack of subject matter jurisdiction or, in the alternative, for failure to state a claim upon which relief may be granted.  The reasons for our motion are set forth in the accompanying memorandum of law.

WHEREFORE, defendant respectfully requests that an order be entered granting defendant's motion to dismiss, denying plaintiff's application for a temporary restraining order and motion for a preliminary injunction, dismissing this action, and granting defendant such other and further relief as may be just and appropriate.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

BY:    /s/ Justin R. Miller
       JUSTIN R. MILLER

Attorney-In-Charge
International Trade Field Office

/s/ Edward Kenny
EDWARD KENNY
Senior Trial Counsel

OF COUNSEL:                              /s/ Nico Gurian
ALEXANDRA KHREBTUKOVA                    NICO GURIAN
JENNIFER PETELLE                         Trial Attorney
ZACHARY SIMMONS                          Department of Justice, Civil Division
Office of Chief Counsel                  Commercial Litigation Branch
U.S. Customs and Border Protection       26 Federal Plaza, Room 346
                                         New York, New York 10278
Dated: July 1, 2024                      (212) 264-0583 or 9230
                                         *Attorneys for Defendant*

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND IN OPPOSSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

EDWARD KENNY
Senior Trial Counsel

OF COUNSEL:                        NICO GURIAN
ALEXANDRA KHREBTUKOVA              Trial Attorney
JENNIFER PETELLE                   Department of Justice, Civil Division
ZACHARY SIMMONS                    Commercial Litigation Branch
Office of Chief Counsel            26 Federal Plaza, Room 346
U.S. Customs and Border Protection  New York, New York 10278
                                   (212) 264-0583 or 9230
Dated: July 1, 2024                *Attorneys for Defendant*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 2

    A.  Customs Trade Partnership Against Terrorism Program (CTPAT) ............................ 2

    B.  Low-Value Imports and the Automated Commercial Environmental Entry
        Type 86 Test (ET86 Test) ................................................................................... 6

    C.  Plaintiff's Participation in the CTPAT Program and ET86 Test ............................... 11

ARGUMENT ...................................................................................................................... 17

  I.    THE COMPLAINT SHOULD BE DISMISSED .......................................................... 17

    A.  Standard of Review ................................................................................................. 17

    B.  The Complaint Should Be Dismissed Because Plaintiff's Claims Are Not Ripe
        for Review ............................................................................................................. 18

    C.  The Complaint Should Be Dismissed for Failure to Challenge Final
        Agency Action ....................................................................................................... 21

    D.  The Complaint Should Be Dismissed Because Plaintiff's Claims Are Moot ............ 25

    E.  Plaintiff's Claims Related to Its Temporary Suspension from CTPAT Should Be
        Dismissed for Failure to Exhaust Its Administrative Remedies ................................ 27

    F.  Plaintiff's Claims Related to Its Temporary Suspension from the ET86 Test Should
        Be Dismissed Because Plaintiff Does Not Have a Property Interest in
        Continued Participation in the ET86 Test ................................................................ 29

 II.    INJUNCTIVE RELIEF SHOULD BE DENIED .......................................................... 31

    A.  Standard of Review ................................................................................................. 32

    B.  Plaintiff Is Not Likely to Succeed on the Merits ..................................................... 33

    C.  Plaintiff Does Not Face Irreparable Harm Absent Injunctive Relief ........................ 34

    D.  Public Interest and Balance of Hardships Do Not Support Injunctive Relief ............. 37

CONCLUSION ................................................................................................................... 38

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbott Labs v. Gardner*,
387 U.S. 136 (1967) ........................................................................................................... 19

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ............................................................................................................. 25

*Am. Ass'n of Exp. & Imp.-Textile & Apparel Grp. v. United States*,
751 F.2d 1239, 1250 (Fed. Cir. 1985) ............................................................................... 29

*Am. Petroleum Inst. v. E.P.A.*,
683 F.3d 382, 387 (D.C. Cir. 2012) ............................................................................. 19, 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................... 18

*Assoc. of Proprietary Coll.'s v. Duncan*,
107 F. Supp.3d 332 (S.D.N.Y. 2015) ........................................................................... 29, 30

*AVCO Fin. Corp. v. Commodity Futures Trading Comm'n.*,
929 F. Supp. 714, 717 (S.D.N.Y. 1996) ............................................................................ 36

*Barrows v. Burwell*,
777 F.3d 106 (2d Cir. 2015) .......................................................................................... 29, 30

*Bd. of Regents v. Roth*,
408 U.S. 564 (1972) ........................................................................................................... 29

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................... 18

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................................... 22, 23, 24

*Browning v. Clinton*,
292 F.3d 235 (D.C. Cir. 2002) ........................................................................................... 18

*Camps v. Pitts*,
411 U.S. 138 (1973) ........................................................................................................... 33

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. U.S*
393 F. Supp. 3d 1271 (Ct. Int'l Trade 2019) ..................................................................... 34

*Corus Staal BV v. United States*,
502 F.3d 1370 (Fed. Cir. 2007)...........................................................................28

*CR Indus. v. United States*,
10 C.I.T. 561 (1986) ...........................................................................................17

*Crawford v. Antonio B. Won Pat Int'l Airport Auth.*,
917 F.3d 1081 (9th Cir. 2019) ............................................................................29

*Darby v. Cisneros*,
509 US 137 (1993)........................................................................................22, 23

*Devia v. Nuclear Regul. Comm'n*,
492 F.3d 421,424 (D.C. Cir. 2007) .....................................................................21

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)............................................................................................22

*FTC v. Standard Oil of Cal.*,
449 U.S. 232 (1980)......................................................................................20, 22

*Full Value Advisors, LLC v. S.E.C.*,
633 F.3d 1101 (D.C. Cir. 2011) .....................................................................19, 20

*Harrison v. PPG Indus., Inc.*,
446 U.S. 578 (1980)............................................................................................23

*Honig v. Doe*,
484 U.S. 305 (1988)............................................................................................21

*In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litig.*,
340 F.3d 749 (8th Cir. 2003) ..............................................................................23

*J. Conrad LTD v. United States*,
457 F. Supp. 3d 1365 (Ct. Int'l Trade 2020) ......................................................32

*JCM, Ltd. v. United States*,
210 F.3d 1357 (Fed. Cir. 2000)...........................................................................17

*Kellogg Brown & Root Servs., Inc. v. United States*,
728 F.3d 1348 (Fed. Cir. 2013)...........................................................................18

*Kent v. Principi*,
389 F.3d 1380 (Fed. Cir. 2004)...........................................................................18

*Kentucky Dep't of Correction v. Thompson*,
490 U.S. 454 (1989)............................................................................................30

*Mazurek v. Armstrong,*
520 U.S. 968 (1997)........................................................................................................ 32

*McBryde v. Comm. to Review,*
264 F.3d 52 (D.C. Cir. 2001) ......................................................................................... 27

*McInnis-Misnor v. Maine Medical Ctr.*
319 F.3d 63, 70 (1st Cir. 2003)....................................................................................... 19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983).......................................................................................................... 33

*Nat'l Parks Conservation Ass'n v. Norton,*
324 F.3d 1229 (11th Cir. 2003) ...................................................................................... 23

*Nevada v. Dept. of Energy,*
457 F.3d 78, 85 (D.C. Cir. 2006) ................................................................................... 20

*Ninestar Corp., v. United States,*
687 F.Supp.3d 1308 (Ct. Int'l Trade 2024) .............................................................. 27, 28

*Nken v. Holder,*
556 U.S. 418 (2009)........................................................................................................ 37

*Pentax Corp. v. Robison,*
125 F.3d 1457 (Fed. Cir. 1997)...................................................................................... 17

*Public Citizen, Inc. v. Fed. Energy Regul. Comm'n,*
92 F.4th 1124 (D.C. Cir. 2024).................................................................................. 25, 26

*Rattlesnake Coal v. EPA,*
509 F.3d 1095 (9th Cir. 2007) ....................................................................................... 21

*Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n,*
324 F.3d 726 (D.C. Cir. 2003) .................................................................................. 24, 25

*Reno v. Catholic Social Servs., Inc.,*
509 U.S. 43 (1993).......................................................................................................... 19

*Role Models Am., Inc. v. White,*
317 F.3d 327 (D.C. Cir. 2003) ....................................................................................... 22

*Secured Mails Sols LLC v. Universal Wile, Inc.,*
873 F.3d 905 (Fed. Cir. 2017)........................................................................................ 18

*S. J. Stile Assoc. Ltd. v. Snyder,*
646 F.2d 522 (C.C.P.A. 1981) ....................................................................................... 35

*Shandong Huarong Gen. Grp. v. United States*,
122 F. Supp. 2d 143 (Ct. Int'l Trade 2000) ................................................ 32

*Sharkey v. Quarantillo*,
541 F.3d 75 (2nd Cir. 2008) ....................................................................... 22

*Sierra Club v. Jackson*,
648 F.3d 848 (D.C. Cir. 2011) ..................................................................... 21

*Silfab Solar, Inc. v. United States*,
892 F.3d 1340 (Fed. Cir. 2018) ................................................................... 32

*Soundboard Ass'n v. FTC*,
888 F.3d 1261 (D.C. Cir. 2018) ................................................................... 22

*Steel Co. v. Citizens For A Better Environment*,
523 U.S. 83 (1998) ...................................................................................... 17

*Sunpreme Inc. v. United States*,
892 F.3d 1186 (Fed. Cir. 2018) ................................................................... 27

*Trump v. Hawaii*,
138 S. Ct. 2392 (2018) ................................................................................ 32

*U.S. Army Corps of Engineers v. Hawkes Co.*,
578 U.S. 590 (2017) .................................................................................... 22

*United Pac. Ins. Co. v. United States*,
464 F.3d 1325 (Fed. Cir. 2006) ................................................................... 17

*Wally Packaging, Inc. v. United States*,
578 F. Supp. 1408 (Ct. Int'l Trade 1984) ................................................... 17

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .............................................................................. 22, 23

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ................................................................. 32, 35, 36, 37

*Yanko v. United States*,
869 F.3d 1328 (Fed. Cir. 2017) ................................................................... 18

*Zenith Radio Corp. v. United States*,
710 F.2d 806 (Fed. Cir. 1983) ..................................................................... 35

**Statutes**

5 U.S.C. § 704 ............................................................................................. 21

6 U.S.C. § 961 ........................................................................................................ 2, 3, 4, 37

6 U.S.C. § 962 ........................................................................................................................... 3

6 U.S.C. §§ 963 ........................................................................................................................ 3

6 U.S.C. § 964 .......................................................................................................................... 3

6 U.S.C. § 965 ......................................................................................................................... 3

6 U.S.C. § 966 . . . .................................................................................................................... 3

6 U.S.C. § 967 .............................................................................................................. 4, 5, 6, 37

19 U.S.C. 1411 ......................................................................................................................... 8

19 U.S.C. § 1321 ................................................................................................................... 6, 7

19 U.S.C. § 1484 ...................................................................................................................... 7

19 U.S.C. § 1498 ...................................................................................................................... 7

19 U.S.C. § 1624 ...................................................................................................................... 8

19 U.S.C. § 4301 ...................................................................................................................... 7

28 U.S.C. § 1581 ................................................................................................................. 28, 33

28 U.S.C. 2637 ...................................................................................................................... 28

**Rules**

USCIT R. 12) ................................................................................................... 1, 17, 18, 21

**Regulations**

19 C.F.R. Part 142 ................................................................................................................... 7

19 C.F.R. Part 143 ............................................................................................................... 7, 10

19 C.F.R. § 101.9 ......................................................................................................... 7, 8, 30, 37

19 C.F.R. § 143.23 ................................................................................................................. 7, 9

19 C.F.R. § 143.26 .......................................................................................................... 7, 8, 9, 31

19 C.F.R. §§ 10.151 ................................................................................................................. 7

19 C.F.R. §§ 10.153 ................................................................................................ 7

19 C.F.R. §§ 143.23 ............................................................................................... 7

**Other Authorities**

*Test Concerning Entry of Section 321 Low-Valued Shipments Through Automated Commercial Environment,*
84 Fed. Reg.40,079 (August 13, 2019)................................... 10, 11, 12, 13, 14, 15, 16

*Test Programs,*
60 Fed. Reg. 14, 211 (Mar. 16, 1995)..................................................................... 8, 30

*National Customs Automation Program Test Concerning Automated Commercial Environment Entry Summary Accounts and Summary,*
73 Fed. Reg. 50,337 (Aug. 26, 2008)..................................................................... 8, 10

*Test Concerning Entry of Section 321 Low-Value Shipments Through the Automated Commercial Environment (ACE) (Also Known as Entry Type 86); Republication With Modifications,*
89 Fed. Reg. 2630 (Jan. 16, 2024) ............................................................................ 10

*Entry Type 86 Guidance*, CBP Publication No. 3564-0224 (Apr. 8, 2024)……......................... 11

*CTPAT Bulletin – Suspension Removal Appeals and Reinstatement Processes*
(Aug. 1, 2021) ..................................................................................................... 4, 5

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: HON. CLAIRE R. KELLY, JUDGE

| | | |
|---|---|---|
| SEKO CUSTOMS BROKERAGE, INC., | : | |
| | : | |
| Plaintiff, | : | Court No. 24-00097 |
| | : | |
| v. | : | **CONFIDENTIAL** |
| | : | |
| UNITED STATES, | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION**

Defendant, United States, respectfully submits this memorandum in support of its motion, pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of International Trade, to dismiss this action for lack of subject matter jurisdiction or, in the alternative, for failure to state a claim upon which relief can be granted, and in opposition to plaintiff's application for a temporary restraining order and motion for preliminary injunction.

**INTRODUCTION**

Plaintiff SEKO Customs Brokerage, Inc. (SEKO or plaintiff) challenges what it describes as U.S. Customs and Border Protection's (CBP) "unlawful suspension" of plaintiff's membership in a voluntary program and a voluntary test administered by CBP, arguing that CBP's actions violated plaintiff's rights under both the Due Process Clause of the Fifth Amendment and the Administrative Procedure Act (APA). Compl. (ECF No. 2 (Public Complaint) ECF No. 19 (Confidential Complaint) ¶ 1. However, the administrative process is still ongoing, and plaintiff's premature attempt to entangle this Court in that process must fail. Moreover, even if the court were to find this case ripe for review, plaintiff seeks relief that it has

already received from the agency—reinstatement into the program and the test and further detailed information from the agency regarding the underlying reasons for its temporary suspensions—and the Court can grant no further relief at this time.

The Court should dismiss the Complaint plaintiff's claims with respect to the Customs Trade Partnership Against Terrorism (CTPAT) and the Automated Commercial Environment Entry Type 86 Test (ET86 Test) because plaintiff's claims: (1) are not ripe for judicial review; (2) are premature because plaintiff does not challenge final agency action as required by the APA; (3) are moot because there is no further relief the Court can provide; and (4) are premature because plaintiff has not exhausted its administrative remedies. In addition, plaintiff's claims with respect to the ET86 Test fail because plaintiff does not have a property interest in continued participation in the ET86 Test and therefore cannot state a claim for relief under the Due Process Clause of the Fifth Amendment.

In the alternative, should the Court reach the merits, plaintiff's application for a temporary restraining order and motion for a preliminary injunction should be denied. Plaintiff is neither likely to succeed on the merits nor to suffer irreparable harm because there is no further relief it can receive from this Court and it cannot overcome numerous threshold legal obstacles. Moreover, the public interest and the balance of hardships strongly disfavor plaintiff's request for injunctive relief.

## STATEMENT OF FACTS

### A. Customs Trade Partnership Against Terrorism Program (CTPAT)

The Customs Trade Partnership Against Terrorism (CTPAT) is a voluntary public-private partnership established by the Security and Accountability for Every Port Act of 2006 (SAFE

2

Port Act)[1] that is intended to "strengthen and improve the overall security of the international supply chain and United States border security, and to facilitate the movement of secure cargo through the international supply chain, by providing benefits to participants meeting or exceeding the program requirements." 6 U.S.C. § 961(a). CTPAT accomplishes this goal by establishing a partnership between CBP and the trade community in which CBP grants participants increased benefits,[2] such as a reduced number of CBP examinations, shorter wait times at the border, and front of the line inspections, so long as participants meet certain security criteria and other requirements. As relevant here, customs brokers are among the members of the trade community who are "eligible to apply to voluntarily enter into partnerships" with CBP under CTPAT, so long as they meet the program's requirements. *See* 6 U.S.C. § 962.

To be eligible to participate in CTPAT, and therefore receive these benefits from CBP, CTPAT applicants must:

- Have a history of moving cargo in the international supply chain;

- Conduct an assessment of their supply chain based on security criteria including business partner requirements; container security, physical security and access controls; personnel security; procedural security; security training and threat awareness; and information technology security.

- Implement and maintain security measures and supply chain security practices that meet security criteria established by CBP; and

- Meet all other requirements, established by the CBP Commissioner, in consultation with the Commercial Customs Operations Advisory Committee.

---

[1] *See* SAFE Port Act, P.L. 109-347, Title II, Subtitle B (Oct. 13, 2006) codified at 6 U.S.C. § 961 *et seq*.

[2] There are three levels of participation in CTPAT: Tier 1, Tier 2, and Tier 3, with more benefits accruing with each increase in tier level. 6 U.S.C. § 961(a). The benefits, guidelines, and timeframes for participants are set forth in 6 U.S.C. § 964 (Tier 1), 6 U.S.C. § 965 (Tier 2), and 6 U.S.C. § 966 (Tier 3).

*See* 6 U.S.C. §§ 963(1)-(4).  Procedures for joining the CTPAT program are also publicly

available on CBP's public website at [CTPAT: Customs Trade Partnership Against Terrorism |](url)

[U.S. Customs and Border Protection (cbp.gov)](url) (under "How Do I Become a Partner") and are

subject to a statutorily mandated annual review, in which CBP reviews CTPAT's minimum

security criteria and updates the requirements as appropriate.  6 U.S.C. § 961(b).

 The SAFE Port Act provides that CBP may deny and revoke a CTPAT partner's benefits,

in whole or in part, if the partner's "security measures and supply chain security practices fail to

meet any requirements" of the program.  6 U.S.C. § 967(a).  If CBP revokes a partner's benefits

in whole or in part, the SAFE Port Act provides that the partner may appeal such a decision to

the Secretary of the Department of Homeland Security within 90 days.  6 U.S.C. § 967(c)(1).

The Secretary has 180 days after the appeal is filed to issue a determination in response to the

appeal.  *Id.*  The Act directs CBP to further "develop procedures that provide appropriate

protections to {CTPAT} participants before benefits are revoked," *id.* § 967(a), though these

procedures cannot limit CBP's ability to protect national security.  *Id.*[3]

 CBP has published guidelines in the CTPAT Bulletin that govern its processes for

suspending and removing CTPAT participants.  *See* U.S. Customs and Border Protection, Office

of Field Operations, *CTPAT Bulletin – Suspension Removal Appeals and Reinstatement*

*Processes* (Aug. 1, 2021), *available at* [CTPAT Bulletin - Suspension Removal Appeals and](url)

[Reinstatement Processes (cbp.gov)](url) ("CTPAT Bulletin").  A CTPAT partner may have its

benefits suspended or removed for failure to adhere to the CTPAT Partner Agreement to

Voluntarily Participate, meet the minimum security requirements or any other eligibility

---

[3] The statute also provides that CBP "shall" suspend or expel participants from CTPAT "for an appropriate period of time" should they knowingly provide false or misleading information during the validation process, during which time CBP will assess the participant's security measures based on CTPAT's minimum security criteria.  6 U.S.C. § 967(b).

requirements as established by CBP, and comply with other rules, laws, and regulations. CTPAT Bulletin at 1. While suspension from CTPAT is "a temporary loss of a Partner's program benefits," *id.* at 3, "removal is a final action the CTPAT program takes as a last resort when it has determined a Partner is unable or unwilling to meet or comply with CTPAT program requirements." *Id.* at 5.[4] When CBP suspends a partner, it provides the partner a suspension letter which includes both the specific reason(s) for the suspension and the requirements the partner must meet to be reinstated into the program. Because "CTPAT is committed to working with its Partners to achieve high levels of compliance," the program will "make every effort to collaborate with Partners on how requirements can be met based on the Partner's business model." *Id.* at 4. This process often includes asking the suspended partner to furnish CBP with a "corrective action plan," which "clearly outlines the measures the Partner will take to remedy the gaps, vulnerabilities, and/or weaknesses identified during their view," as well as "address the actions required to be in compliance with the CTPAT program." *Id.* at 5. Should a partner "fai[l] to follow actions required in order to maintain membership in the program," they become subject to removal from CTPAT. *Id.*

CBP's procedures provide CTPAT partners with an appeal process should they disagree with either their suspension or removal. An appeal of a suspension must be in writing and address the issues outlined in the suspension letter, including, but not limited to, providing evidence of completed required actions, completing validation responses, completing security profile updates, cooperating in reviews of security breaches, and providing other documented evidence as required by CTPAT. *Id.* at 8. As explained above, the SAFE Port Act requires the

---

[4] However, immediate action may be taken to remove a partner if necessary to protect national security. *See* CTPAT Bulletin at 5.

CTPAT program to make a decision on an appeal within 180 days from the date on which the appeal is filed.  6 U.S.C. § 967(c).[5]  The partner will be notified in writing of the result of the appeal to the suspension or removal.  To be reinstated into the program after an incident or violation, the company must agree to a corrective action plan which identifies specific objectives and timeframes within which those objectives should be reached.  When CTPAT has determined a partner has met all necessary requirements for reinstatement of benefits, the partner may be reinstated.  *Id.* at 9.  A partner may be "conditionally reinstated" if further follow-up is required by the CTPAT program to ensure the partner remains in compliance with program requirements. *Id.* at 10.  The reinstatement letter will contain the conditions of the reinstatement that must be met in order to remain a partner, in good standing, in the program.  A partner may be fully reinstated if they have met all of the conditions or requirements contained in their suspension/removal letter.  *Id.* at 9-10.  Should a partner have concerns about meeting the conditions set forth in the reinstatement letter, or need additional time to meet those conditions, it may communicate with its designated point of contact at CBP, who will consider a partner's requests for extension and other requests.  *Id.*

**B.  Low-Value Imports and the Automated Commercial Environmental Entry Type 86 Test (ET86 Test)**

Section 321 of the Tariff Act of 1930, as amended, authorizes Treasury Department regulations that in turn authorize CBP to, *inter alia*, admit, free of duty and tax related to importation, shipments of merchandise (other than bona-fida gifts and certain personal and

---

[5] If a partner appeals the Commissioner's decision of suspension or expulsion that resulted from CBP having determined that the participant provided false or misleading information during the validation process, the participant must file an appeal with the Secretary within 30 days of the date of decision.  6 U.S.C. § 967(c)(2).  The Secretary has 180 days after the date the appeal is filed to issue a determination.  *Id.*

household goods accompanying travelers arriving from abroad) that are imported by one person

on one day and having an aggregate fair retail value in the country of shipment of not more than

$800.  *See* 19 U.S.C. § 1321(a)(2)(C), as amended by the Trade Facilitation and Trade

Enforcement Act of 2015 (TFTEA), Section 901, Public Law 114-125, 130 Stat. 122 (19 U.S.C.

§ 4301 note), and 19 C.F.R. §§ 10.151 and 10.153.  As relevant here, 19 C.F.R. § 10.151

provides that merchandise subject to this exemption shall be entered under the "informal entry

procedures" as set forth in 19 C.F.R. part 143, subpart C.  CBP refers to these informal entry

procedures for low-value shipments as the "release from manifest" process because, unlike

imports subject to the formal entry process[6] and the informal entry process for shipments not

exceeding $2,500 in value and not eligible for the administrative exemption at 19 U.S.C. §

1321(a)(2)(C),[7] such shipments are released from CBP custody based solely on the information

provided on the manifest or bill of lading.  This information is typically provided by the carrier

(as the nominal consignee), though it could also be filed by owners, purchasers, or designated

customs brokers using "reasonable care."  *See* 19 C.F.R. § 143.23(j)(3); *see also id.* § 143.26(b).[8]

Finally, the "release from manifest" process does not apply to importations that are subject to

additional reporting or other documentation requirements imposed by and under the authority of

other government agencies (known as Partner Government Agency (PGA) data requirements).

    CBP has broad general testing authority pursuant to 19 C.F.R. § 101.9(a), which was

promulgated pursuant to authority under section 624 of the Tariff Act of 1930 (19 U.S.C. §

---

[6]  *See* 19 U.S.C. § 1484; 19 C.F.R. Part 142.

[7] *See* 19 U.S.C. § 1498; 19 C.F.R. §§ 143.23; 143.26(a).

[8] The required information is: "(1) Country of origin of the merchandise; (2) Shipper name, address and country; (3) Ultimate consignee name and address; (4) Specific description of the merchandise; (5) Quantity; (6) Shipping weight; and (7) Value." 19 C.F.R. § 143.23(k).

1624) to make such rules and regulations as may be necessary to carry out the provisions of the

Tariff Act of 1930, *See* Dep't of the Treasury, Customs Service, *Test Programs*, 60 Fed. Reg.

14,211 (Mar. 16, 1995) (final rule),[9] and which provides in relevant part:

> For purposes of conducting a test program or procedure designed to
> evaluate the effectiveness of new technology or operational
> procedures regarding the processing of passengers, vessels, or
> merchandise, the Commissioner of CBP may impose requirements
> different from those specified in the CBP Regulations, but only to
> the extent that such different requirements do not affect the
> collection of the revenue, public health, safety, or law enforcement.

19 C.F.R. § 101.9(a).

On April 13, 2019, CBP announced that, in light of the "growing volume of Section 321

low-valued shipments resulting from the global shift in trade to an e-commerce platform," CBP

would be "conducting a test to allow Section 321 low-valued shipments, including those

shipments subject to [PGA] data requirements, to be entered by filing a new type of informal

entry electronically in [ACE]." 2019 ET86 Test Announcement, 84 Fed. Reg. at 40,080. The

ET86 Test seeks to evaluate the effectiveness of new ACE functionality to aid CBP in

performing its mission in light of the marked increase in Section 321 low-value imports largely

driven by cross-border e-commerce. *See id.* at 40,080.

The test is "open to all owners, purchasers, consignees, and designated customs brokers

of Section 321 low-valued shipments, including those subject to PGA requirements, imported by

all modes of cargo transportation," and CBP "encourage[d] all eligible parties to participate in

---

[9] The regulation promulgated by this rulemaking provides for two separate testing authorities:
the authority "[f]or purposes of conducting an approved test program or procedure designed to
evaluate planned components of the National Customs Automation Program (NCAP), as
described in section 411(a)(2) of the Tariff Act of 1930, as amended (19 U.S.C. 1411)," in
19 C.F.R. § 101.9(b), and the general testing authority under 19 C.F.R. § 101.9(a). The ET86
Test was established pursuant to the general testing authority under 19 C.F.R. § 101.9(a) and the
separate NCAP testing authority under 19 C.F.R. § 101.9(b) is not relevant here.

this test to test the functionality of the new entry type." *Id.* at 40,081.  Among other differences

from the "release from manifest" process, the ET86 Test modified the regulatory authorization

for consignees to make Section 321 entries, which, in turn, substantially changed the role of

customs brokers in the low-value entry environment.  *Compare* 19 C.F.R. § 143.26(b), *with* 84

Fed. Reg. at 40,081 (explaining that for purposes of the ET86 Test, CBP is deviating from 19

C.F.R. § 143.26(b)).  Under the "release from manifest" process, which remains the regulatory

entry process for Section 321 entries other than those filed by participants in the ET86 Test,

customs brokers are rarely used, because, under the existing regulations, a carrier's manifest

filing does not require the use of a broker and the manifest filing alone is generally sufficient to

serve as the entry document for low-value entries.  *See* 19 C.F.R. §§ 143.23(j)-(k).  By contrast,

the ET86 Test requires that consignees intending to file an entry type 86 appoint a licensed

customs broker to act as the Importer of Record (IOR) for the shipment (owners and purchasers

could appoint a broker if desired but could also file type 86 entries in their own right).  *See* 84

Fed. Reg. at 40,081.

    As a result, the ET86 Test created a new role for customs brokers in the Section 321 entry

environment, where consignees wishing to participate in the test, rather than continuing to use

the release from manifest process under the current regulations, would need a customs broker to

serve as the IOR for the shipment and file type 86 entries on their behalf.  The ET86 Test also

added to the data elements required to be filed with a type 86 entry, as compared with the

information required for "release from manifest" entries, *see* 19 C.F.R. § 143.23(j)(3)-(k).  In

particular, the ET86 Test required submission of the 10-digit HTSUS classification, which is not

required to be provided to CBP in the "release from manifest" entry process.  *Compare* 84 Fed.

Reg. at 40,082 (required data elements for entry type 86), *with* 19 C.F.R. § 143.23(k) (required

information for "release from manifest" entry).  In addition, type 86 entries require (as a

conditional data element when the shipment is subject to PGA data reporting requirements) the

IOR number of the owner, purchaser or broker when designated by a consignee.  *See* 84 Fed.

Reg. at 40,082.

      CBP announced that "[t]o participate in this test, an owner, purchaser, or customs broker

appointed by an owner, purchaser, or consignee will file an informal entry type '86' in ACE

through [the Automated Broker Interface or] ABI."  2019 ET86 Test Announcement, 84 Fed.

Reg. at 40,081.[10]  CBP also made clear, however, that participation in the test was voluntary and

not required to obtain the benefit of the so-called "de minimis" duty exemption for qualifying

merchandise, because the "release from manifest" entry process under the current regulations

remains available, subject to the existing regulatory conditions, noting that "[i]mporters of

Section 321 low-valued shipments that do not contain any PGA data requirements may continue

to utilize the 'release from manifest' process or may utilize the ACE Entry Type 86 Test." *Id.*

The August 2019 Federal Register notice also stated that test participants "may be subject to civil

and criminal penalties, administrative sanctions, or liquidated damages for any of the following:

(1) Failure to follow the rules, requirements, terms and conditions of this test; (2) Failure to

exercise reasonable care in the execution of participant obligations; or (3) Failure to abide by

applicable laws and regulations that have not been waived."  84 Fed. Reg. at 40,082.

---

[10] "ABI allows participants to electronically file all required import data with CBP, and transfers
that data into ACE. To participate in ABI, a filer must meet the requirements and procedures set
forth in 19 CFR part 143, subpart A, and must meet the technical requirements set forth in the
Customs and Trade Automated Interface Requirements (CATAIR)."  *Id.* (noting, at *id.* n.2, that
"a complete discussion on the procedures for obtaining an ACE Portal Account" may be found in
the General Notice of August 26, 2008, 73 Fed. Reg. 50,337).

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

On January 16, 2024, CBP issued another Federal Register notice, modifying certain aspects of the ET86 Test. *Test Concerning Entry of Section 321 Low-Value Shipments Through the Automated Commercial Environment (ACE) (Also Known as Entry Type 86); Republication With Modifications*, 89 Fed. Reg. 2630 (Jan. 16, 2024). As relevant here, the update clarified that CBP may suspend or remove a ET86 Test participant from "further participation in the ACE Entry Type 86 Test based on a determination that that filer's participation in the test poses an unacceptable compliance risk." *Id.* at 2634.[11]

### C. Plaintiff's Participation in the CTPAT Program and ET86 Test

SEKO has participated in the CTPAT program and has filed type 86 entries pursuant to the ET86 Test. ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████  ██  ████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████

---

[11] In addition to the 2019 and 2024 Federal Register Notices, CBP has also recently published on its website a "Guidance Fact Sheet" for ET86 filings. *Entry Type 86 Guidance*, CBP Publication No. 3564-0224 (Apr. 8, 2024), *available at* CBP.gov (Home>Newsroom>Documents Library> Fact Sheet: Entry Type 86 Guidance), https://www.cbp.gov/document/fact-sheets/fact-sheet-entry-type-86-guidance. In this guidance, CBP clarified in particular the standards of care that apply to a broker when filing an entry type 86, including that "a broker must act as the importer of record when filing an entry type 86 on behalf of a consignee," as well as responding to other frequent questions from filers, such as "[w]ho has the right to make entry and who may issue the Power of Attorney for an entry type 86?"; "[w]ho is the 'person' for purposes of the 'imported by one person on one day and exempted from the payment of duty' value cap for an entry type 86?"; "[w]hat is the actionable date in the transaction for the $800 per person per day parameter?"; and "[i]s a broker required to obtain a commercial invoice to support an entry type 86 and, if not, what is the requirement for a merchandise description to support an entry type 86?" *See generally id.*

[12] The Government is treating as confidential the material SEKO has marked as confidential thus far in the litigation. Accordingly, the Government is filing both confidential and public versions of its motion.

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

On July 17, 2023, CBP alerted SEKO to potential violations of the ET86 Test entry requirements and requested documentation from SEKO related to ten specific entries. *See* Ex. C to Compl. (CBP July 17, 2023 Letter) ECF No. 19 at 30.[13] In particular, CBP requested copies of relevant information concerning the ten entries, including ███████████████

████████████████████████████████████████ *Id.* On September 29, 2023, CBP notified SEKO that CBP had detected ████████████████ in its review of the ten entries for which the agency had requested information in its July 17, 2023 letter. *See* Ex. D to Compl. (CBP Sept. 29, 2023 Letter) ECF No. 19 at 32-33. CBP provided SEKO with detail regarding the identified ███████████, stating that the ████████████ resulted from SEKO ███████████

████████████████████████████████ CBP Sept. 29, 2023 Letter at 32. Citing to specific statutes, regulations, and test requirements that were applicable to SEKO's type 86 entry filings, CBP also gave SEKO information regarding how to comply with these requirements ████████████████████

███████████████████████████████ *Id.* at 32-33. On October 24, 2023, SEKO responded to CBP regarding the specific areas of violation that CBP cited in the CBP Sept. 29, 2023 Letter

---

[13] For ease of reference, where possible, the Government will provide ECF cites for documents already available on the Court's docket. For such citations, page numbers refer to ECF page numbers.

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

and explained various system controls and steps it had implemented to facilitate compliance with the ET86 Test requirements.  Ex. E to Compl. ECF No. 19 at 35-37.

On January 22, 2024, CBP informed SEKO of the agency's ongoing concerns regarding SEKO's "submitted Entry Type 86 filings that were ███████████████████████████
███████████████████████████████████  *See* Ex. F to Compl. (CBP Jan. 22 2024 Letter) ECF No. 19 at 46-47.  To verify SEKO's compliance with the requirements of the ET86 Test, CBP requested, for an additional ten entries, ███████████████████████████████████
███████████████████████████████████████████████████████████████████████████
████████  *Id.* at 46. On January 30, 2024, SEKO responded to the CBP Jan. 22, 2024 Letter with the requested documents.  Compl. ¶ 42.

On May 17, 2024, CBP suspended plaintiff from the CTPAT program.  *See* Ex. A to Compl. (CBP May 17, 2024 CTPAT Suspension Letter) ECF No. 19 at 21-22.  CBP stated that SEKO ███████████████████████████████████████████████████████████████
███████████████████████████████████████████  *Id.* at 22.  Based on this finding, CBP determined that SEKO was ███████████████████████████████
███████████████████████████████████  *Id.*  CBP's letter additionally provided SEKO with 90 calendar days to "develop and implement an action plan that demonstrates . . . that it has taken sufficient remedial actions to ███████████████████████████████████████████
███████████████████████████████████  *Id.*  CBP further advised that SEKO may be removed from the CTPAT program if it was "unable or unwilling to comply with these requirements within 90 calendar days from the date" of the letter.  *Id.*  Finally, CBP explained that should SEKO disagree with CBP's suspension decision SEKO could submit a written appeal to CBP within 90 days.  *Id.* at 22.

13

On May 20, 2024, CBP suspended plaintiff from the ET86 Test. *See* Ex. G to Compl. (CBP May 20, 2024 ET86 Suspension Letter) ECF No. 19 at 49-50.  CBP stated that SEKO

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

*Id.* at 49.  In CBP's

view, ████████████████████████████████████████████

████████████████  *Id.*  Additionally, CBP identified that it had ███████████

██████████████████████████████████████████████

████████████████████████████████████  *Id.*  Based on these grounds,

CBP determined that SEKO's ██████████████████████████████████████

██████ and suspended SEKO from the ET86 Test for a period of 90 days, starting May 27, 2024

and lasting until at least August 24, 2024.  *Id.* at 49-50.  CBP stated that prior to reinstatement,

SEKO must "develop and implement an action plan that demonstrates to CBP ██████████

███████████████████████████████████████████████████████

████████████████████████  *Id.* at 50.  CBP clarified that if no response was

received, the suspension would remain indefinite.  *Id.*

On May 23, 2024, SEKO, through counsel, responded to CBP's May 17 and May 20,

2024 CTPAT and ET86 Test suspension letters.  *See* May 23, 2024 Letter from SEKO to CBP

(attached hereto as Ex. D).  On May 31, 2024, CBP issued two conditional reinstatement letters

to SEKO, giving it 90 days to take corrective action, while remaining eligible for full

participation in both the CTPAT program and the ET86 Test.  *See* Ex. I to Compl. ECF No. 19 at

56-57 (CBP May 31, 2024 CTPAT Conditional Reinstatement Letter) & ECF No. 19 at 54-55

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

(CBP May 31, 2024 ET86 Conditional Reinstatement Letter).  In the CTPAT conditional

reinstatement letter, CBP identified the following "minimum" courses of action to be taken by

plaintiff in connection with its participation in the CTPAT program beyond the conditional 90-

day reinstatement period:



CBP May 31, 2024 CTPAT Conditional Reinstatement Letter at 56.

In the ET86 Test Conditional Reinstatement Letter, CBP identified the "minimum"

course of corrective action for SEKO to undertake in connection with its participation in the

ET86 Test beyond the conditional 90-day reinstatement period, specifically, to ███████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████  CBP May 31, 2024 ET86 Conditional Reinstatement Letter at 54.  Additionally,

the plan must ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[14] *See* https://www.cbp.gov/document/guidance/ctpat-us-customs-brokers-msc-2021.

███████████████████████████ *Id.* CBP provided SEKO with 30 days to submit its corrective action plan and noted that SEKO may be resuspended from the ET86 Test if it fails to submit an updated corrective action plan or if CBP identifies further evidence of noncompliance. *Id.*

On June 1, 2024, SEKO filed the Complaint in this action as well as an application for a temporary restraining order and motion for preliminary injunction. *See* Pl.'s Mot. for Prelim. Inj. (ECF No. 8 (public motion) & ECF No. 21 (confidential motion)). On June 11, 2024, as part of CBP's continued engagement with SEKO in the administrative process, CBP sent a follow up letter to its May 31, 2024 conditional reinstatement letters, providing SEKO with further detailed information regarding specific examples of violations discovered by CBP with regard to SEKO's ET86 Test entries. *See* Ex. A to Govt.'s Resp. to Pl.'s Mot. to Expedite (CBP June 11, 2024 Letter) ECF No. 30-1.

CBP provided the letter to SEKO in order to "assist SEKO in the development of its action plan to ensure compliance with ET86 Test requirements and other applicable regulatory requirements." *Id.* at 2. The non-exhaustive list of examples provided plaintiff with an in-depth breakdown of the myriad compliance issues identified by CBP in its analysis of both the ten entries for which CBP had originally requested information on July 17, 2023, ████████████ ████████████████████████████████████████████, and the ten entries for which CBP requested information on January 22, 2024. *Id.* at 3-10. In addition, beyond the issues discovered with these twenty entries, CBP also noted that there had been ███████████████████████ involving SEKO's ET86 entries, *id.* at 6 (providing an example), and that it had ██████████████████████ ████████████████████████████████████ *Id.* at 10 (providing an example). The

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

letter went on to explain that because the violations identified in the letter were non-exhaustive, SEKO "should be reviewing all of entries in formulating and implementing its corrective action plan." *Id.* As CBP explained, █████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

*Id.* at 2-3. SEKO and CBP continue to engage with each other on SEKO's pending compliance issues related to its participation in the ET86 Test and CTPAT.

## ARGUMENT

### I.    THE COMPLAINT SHOULD BE DISMISSED

#### A.    Standard of Review

The Court's determination of its subject matter jurisdiction is a threshold inquiry. *Steel Co. v. Citizens For A Better Environment*, 523 U.S. 83, 94-95 (1998); *CR Indus. v. United States*, 10 C.I.T. 561, 562 (1986) ("It is fundamental that the existence of a jurisdictional predicate is a threshold inquiry in which plaintiff bears the burden of proof."). Whether to grant a motion to dismiss for lack of jurisdiction is a question of law. *JCM, Ltd. v. United States*, 210 F.3d 1357, 1359 (Fed. Cir. 2000). Where jurisdiction is challenged pursuant to Rule 12(b)(1), the burden rests on the plaintiff to establish the basis for jurisdiction. *Pentax Corp. v. Robison*, 125 F.3d 1457, 1462 (Fed. Cir. 1997), *modified, in part*, 135 F.3d 760 (Fed. Cir. 1998); *see also Wally Packaging, Inc. v. United States*, 578 F. Supp. 1408, 1410 (Ct. Int'l Trade 1984).

A motion to dismiss for failure to state a claim is appropriate when a plaintiff's allegations do not entitle it to a remedy.  *See United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327 (Fed. Cir. 2006).  The motion "tests the legal sufficiency of a complaint," *see Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002), which must be dismissed if it fails to present a legally cognizable right of action.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Dismissal is required when a complaint fails to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "In deciding a motion to dismiss, the court must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant," *see Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1365 (Fed. Cir. 2013) (citation omitted), but need not accept legal conclusions contained in the same allegations.  *See Twombly*, 550 U.S. at 555.  Nor is this Court bound to "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" in ruling on a 12(b)(6) motion.  *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) (internal quotations and citations omitted).

Interpretations of governing legal authorities, such as statutes and regulations, involve questions of law.  *See Kent v. Principi*, 389 F.3d 1380, 1384 (Fed. Cir. 2004) (interpretation of a statute or regulation is a question of law) (citation omitted); *see also Yanko v. United States*, 869 F.3d 1328, 1331 (Fed. Cir. 2017) (treating as a "pure legal issue of statutory interpretation" a claim based on interpretation of statutory provision and related executive order).  Such issues are appropriately resolved under Rule 12(b)(6).  *See, e.g., Yanko*, 869 F.3d at 1331 (citation omitted).

As we demonstrate below, plaintiff's complaint is subject to dismissal based on a number of distinct but related doctrines including, ripeness, non-final agency action, mootness, failure to exhaust administrative remedies, as well as failure to state a claim under the Due Process Clause of the Fifth Amendment.  We discuss each in turn.

**B.**     **The Complaint Should Be Dismissed Because Plaintiff's Claims Are Not Ripe for Review**

The Complaint should be dismissed because plaintiff attempts to draw this Court into an ongoing administrative process, and its claims are therefore not ripe.  The ripeness doctrine, which reflects both "Article III limitations on judicial power" and "prudential reasons for refusing to exercise jurisdiction," *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993), "prevent[s] courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies and also .  .  . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Abbott Labs. V. Gardner*, 387 U.S. 136, 148-49 (1967).  "Prudence . . . restrains courts from hastily intervening into matters that may be best reviewed at another time or in another setting, especially when the uncertain nature of an issue might affect a court's ability to decide intelligently."  *Full Value Advisors, LLC v. S.E.C.*, 633 F.3d 1101, 1106 (D.C. Cir. 2011) (citation omitted).  When determining whether an issue is ripe, courts must evaluate "both the fitness of the issues for judicial review and the hardship to the parties of withholding consideration."  *Abbott Labs.*, 387 U.S. at 149.

Both ripeness factors support dismissal.  First, the issues are not fit for judicial review. "The fitness requirement is primarily meant to protect the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting."  *Am. Petroleum Inst. v.*

*E.P.A.*, 683 F.3d 382, 387 (D.C. Cir. 2012); *see McInnis-Misnor v. Maine Medical Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) ("[T]he critical question concerning fitness for review is whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all."). Here, there can be no dispute that the administrative process is ongoing and the outcome of that process is contingent on future unknown events: plaintiff is yet to develop a satisfactory remedial plan as required by CBP as a condition of plaintiff's non-conditional reinstatement into CTPAT and the ET86 Test, and CBP has not had an opportunity to evaluate or engage in a dialogue with plaintiff regarding such a plan. Moreover, while "final agency action under the Administrative Procedure Act is a crucial prerequisite for ripeness," *Nevada v. Dept. of Energy*, 457 F.3d 78, 85 (D.C. Cir. 2006), here, as discussed *infra*, Sections C and E, CBP has not taken final action as to plaintiff's status in CTPAT or the ET86 Test, and plaintiff has not exhausted CTPAT's administrative appeal process.

The hardship factor likewise supports dismissal. For this factor, courts "do not consider direct hardship, but rather whether *postponing* judicial review would impose an undue burden on the parties or would benefit the court." *Full Value Advisors, LLC*, 633 F.3d at 1106 (emphasis in the original) (cleaned up). "Considerations of hardship that might result from delaying review will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions." *Am. Petroleum Inst.*, 683 F.3d at 389. Here, postponing review until the agency has concluded its administrative process will not impose an undue burden on plaintiff because plaintiff has received its requested relief: plaintiff is currently able to participate in both CTPAT and the ET86 Test and has the information it requested from CBP to facilitate its development of a remedial plan to meet CBP's conditions of reinstatement. At the same time, declining review at this juncture would benefit the Court because either the administrative process will conclude

to plaintiff's satisfaction, thereby making intervention unnecessary or, should plaintiff still seek

judicial intervention, the Court will be able to review a final agency action on a completed

record, as contemplated by the APA. *See FTC v. Standard Oil Co. of Cal.*, 499 U.S. 232, 242

(1980) ("[Premature] [j]udicial intervention into the agency process . . . leads to piecemeal

review which at the least is inefficient and upon completion of the agency process might prove to

have been unnecessary."); *Devia v. Nuclear Regul. Comm'n,* 492 F.3d 421, 424 (D.C. Cir. 2007)

(noting that part of the rationale for determining a claim is not ripe is that "if we do not decide

the claim now, we may never need to").

For these reasons, plaintiff's claims are not ripe, and the Court should dismiss plaintiff's

complaint.

### C.    The Complaint Should Be Dismissed for Failure to Challenge Final Agency Action

Plaintiff's claims should also be dismissed because plaintiff has failed to meet the

bedrock APA requirement that only "final agency action" is subject to Court review.[15]  CBP has

not taken any "final action" and is still actively engaged in the administrative process with

respect to plaintiff's status in CTPAT and in the ET86 Test.

The APA makes only a "*final* agency action for which there is no other adequate remedy

in a court . . . subject to judicial review." 5 U.S.C. § 704 (emphasis added).  The Supreme Court

has explained that:

---

[15] There is a split among the Circuits as to whether lack of final agency action is properly addressed as a matter of subject matter jurisdiction under Rule 12(b)(1) or failure to state a claim under Rule 12(b)(6).  *Compare, e.g.*, *Rattlesnake Coal v. EPA*, 509 F.3d 1095, 1104 (9th Cir. 2007) (holding that lack of final agency action meant that there was no jurisdiction for the district court to review plaintiff's claim) *with Sierra Club v. Jackson*, 648 F.3d 848, 853-54 (D.C. Cir. 2011) (holding that final agency action is not a jurisdictional issue and challenges based on final agency action should be analyzed under Rule 12(b)(6)).  Defendant moves on both grounds, and the Court need not take a position on this Circuit split to decide Defendant's motion.

> two conditions must be satisfied for agency action to be 'final': First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

*Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations and internal quotation marks omitted).

For the first prong, the inquiry looks to whether the decisionmaker has "arrived at a *definitive* position on the issue." *Darby v. Cisneros*, 509 U.S. 137, 144 (1993) (emphasis added). In addition, under the first prong, "[t]he decisionmaking processes set out in an agency's governing statutes and regulations are key to determining whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1271 (D.C. Cir. 2018).

For the second prong, courts look to whether the action has "direct and appreciable legal consequences," *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2017) (quoting *Bennett*, 520 U.S. at 178), including by "impos[ing] an obligation, deny[ing] a right, or fix[ing] some legal relationship." *Role Models Am., Inc. v. White*, 317 F.3d 327, 331-32 (D.C. Cir. 2003) (citation omitted). The Supreme Court has interpreted the finality element in a "pragmatic way," *Sharkey v. Quarantillo*, 541 F.3d 75, 88 (2nd Cir. 2008) (quoting *Standard Oil of Cal.*, 449 U.S. at 239), and "each prong of *Bennett* must be satisfied independently for agency action to be final." *Soundboard Ass'n*, 888 F.3d at 1267. When evaluating finality, therefore, "the core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001).

Plaintiff can satisfy neither prong.

First, CBP's temporary suspensions of plaintiff from CTPAT and the ET86 Test were not the consummation of the agency's decisionmaking process regarding plaintiff's status in both programs. As an initial matter, the suspensions were temporary—CBP conditionally reinstated plaintiff into both programs within days—and were therefore precisely of the "tentative or interlocutory nature" that *Bennett* holds to be nonfinal. *See In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litig.*, 340 F.3d 749, 756 (8th Cir. 2003) (holding that a "temporary closure order" closing a Native American tribe's casino was not a "final agency action"—"even though it may have an immediate effect on the [t]ribe's finances in the near term"—because the closure order was "on a temporary basis" pending further administrative review).

In addition, CBP's publicly available guidance for CTPAT—a "key" to determining whether the first *Bennett* prong has been met—indicates that there is still much process to undergo before the agency reaches a final decision. First, plaintiff must submit a satisfactory remediation plan pursuant to the conditional reinstatement letters. If plaintiff does submit a plan, CBP will evaluate the plan and engage with plaintiff before determining how to proceed with plaintiff's participation in CTPAT. At that point, should CBP decide to issue a final removal or suspension notice to plaintiff, plaintiff will be afforded the opportunity to make a formal appeal of CBP's decision, and CBP will then have 180 calendar days to notify plaintiff of its decision in writing. Accordingly, CBP has plainly not "rendered its last word" as to plaintiff's status in CTPAT, *Am. Trucking Ass'ns*, 531 at 478 (quoting *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 586 (1980)), and therefore plaintiff cannot satisfy the first *Bennett* prong.

Similarly, CBP's ET86 Test conditional reinstatement letter to plaintiff indicates that the administrative process is also still ongoing and the agency has not reached a "definitive position" with regard to SEKO's continued participation in the ET86 Test after the conclusion of the

conditional reinstatement period. *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003) (quoting *Darby*, 509 U.S. at 144). First, plaintiff must develop and implement an updated action plan that demonstrates to CBP that plaintiff will have taken sufficient remedial actions to ensure compliance with the ET86 Test requirements, for which CBP has offered ongoing dialogue if plaintiff continues to have questions in this regard. *See* CBP May 31 ET86 Conditional Reinstatement Letter at 56-57. Then, CBP will review plaintiff's action plan and its implementation to assess whether plaintiff's ET86 entries continue to present an unacceptable risk of noncompliance and to determine whether plaintiff will be permitted to continue to participate in the ET86 Test after the conclusion of the conditional reinstatement period. *Id.* at 56.

Next, CBP's temporary suspensions of plaintiff from CTPAT and the ET86 Test have not had the "direct and appreciable consequences" for plaintiff to meet *Bennett*'s second prong. As explained above, CBP lifted plaintiff's suspensions within days and has conditionally reinstated plaintiff into both programs. At this time, therefore, plaintiff is free to participate in both programs in the same manner as all other brokers. To be sure, plaintiff's participation beyond the initial 90 days granted in conditional reinstatement letters is dependent upon plaintiff meeting certain requirements. But the decision plaintiff is faced with—meet the conditions or risk suspension or removal from the programs—is a "practical" concern that does not rise to the level of "legal consequences" for the purposes of the second *Bennett* prong. *Cf. Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003) (holding that the "practical consequences" of agency action for plaintiff "between voluntary compliance with the agency's request for corrective action" and the "prospect" of plaintiff defending itself from a future enforcement action did not satisfy the second prong of *Bennett*.)

In sum, neither *Bennett* prong is met in this case.  Indeed, this is precisely the type of situation that the final agency rule was designed to shield from premature judicial review:

> The interest in postponing review is powerful when the agency position is tentative.  Judicial review at that stage improperly intrudes into the agency's decisionmaking process.  It also squanders judicial resources since the challenging party still enjoys an opportunity to convince the agency to change its mind.

*Id*.  Here, CBP intends to continue the dialogue with plaintiff in the hope that plaintiff can establish a plan to meet the necessary compliance requirements to productively and safely participate in CTPAT and the ET86 Test.  The agency's position with respect to plaintiff's status in these programs is "tentative" and judicial intervention at this time is therefore premature and not contemplated by the APA.  Accordingly, plaintiff's claims should be dismissed.

### D.    The Complaint Should Be Dismissed Because Plaintiff's Claims Are Moot

To the extent the Court determines plaintiff's claims are ripe for review, the Complaint should be dismissed because plaintiff has already received the relief it seeks from the Court and therefore its claims are moot.  "Derived from Article III, the mootness doctrine ensures that federal courts decide only 'actual, ongoing controversies.'" *Public Citizen, Inc. v. Fed. Energy Regul. Comm'n*, 92 F.4th 1124, 1127 (D.C. Cir. 2024) (citing *Honig v. Doe*, 484 U.S. 305, 317 (1988)).  "Under this doctrine, even where litigation poses a live controversy when filed, a federal court must refrain from deciding the dispute if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Public Citizen, Inc.*, 92 F.4th at 1127 (citations and internal quotation marks omitted and alterations adopted); *see also Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("No matter how vehemently the parties continue to dispute the lawfulness of the

conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.") (citation and internal quotation marks omitted).

Here, no "actual, ongoing controvers[y]" exists between the parties for which the court may provide relief at this time. Plaintiff initiated this lawsuit to seek both reinstatement into CTPAT and the ET86 Test and an order requiring CBP to provide plaintiff with the facts underlying plaintiff's ET86 Test violations that formed the basis for CBP's decision to temporarily suspend Plaintiff from both CTPAT and the ET86 Test in the first instance. Plaintiff has now received this requested relief from the agency. First, CBP has conditionally reinstated plaintiff into both CTPAT and the ET86 Test. *See* CBP May 31, 2024 CTPAT Conditional Reinstatement Letter and CBP May 31, 2024 ET86 Conditional Reinstatement Letter. Plaintiff is therefore free to make entries pursuant to the ET86 Test and retains full CTPAT benefits, in the same manner as other participants, until August 29, 2024. To remain eligible to participate in CTPAT and the ET86 Test after August 29, 2024, plaintiff must meet certain compliance conditions, including the development and implementation of an updated action plan that demonstrates to CBP that plaintiff can ensure compliance with CTPAT and ET86 Test requirements.

Plaintiff alleges that it needs relief from the Court because CBP has not provided plaintiff with a detailed list of the violations that led to plaintiff's temporary suspensions from CTPAT and the ET86 Test. Compl. ¶¶ 51-53. However, CBP's June 11, 2024 Letter to plaintiff provided plaintiff with detailed examples of violations discovered by CBP with respect to certain of plaintiff's ET86 Test entries. CBP June 11, 2024 Letter. The CBP June 11, 2024 Letter provided plaintiff with an in-depth, entry-by-entry breakdown of the compliance issues identified

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

by CBP in its analysis of both the ten entries for which CBP had originally requested information on July 17, 2023, including the fact that ███████████████████████████████ ███████████ in each of those ten entries, and the ten entries for which CBP requested information on January 22, 2024. *Id.* at 2-9. In addition, CBP noted that it had "discovered multiple instances of SEKO's ET86 entries ███████████████████████ ███████████ *Id.* at 9; *see* Order (ECF No. 32) at 4 ("[plaintiff] has been provided with a detailed explanation of the underlying violations in the T86 Program that led to its suspension under both programs so that it may take remedial action required by Customs and convert its 90-day conditional reinstatement into an unconditional reinstatement into both programs.").

In other words, plaintiff has now received the relief it sought in the Complaint. Plaintiff can participate in both CTPAT and the ET86 Test and has been given "indications as to the specific violations leading to the initial [CTPAT and ET86 Test] suspension in the first place." Compl. ¶ 51. Therefore, there is no legal case or controversy for which the Court can provide relief and the case is moot. *See McBryde v. Comm. to Review*, 264 F.3d 52, 55 (D.C. Cir. 2001) ("If events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot.").

### E. Plaintiff's Claims Related to Its Temporary Suspension From CTPAT Should Be Dismissed for Failure to Exhaust Its Administrative Remedies

Plaintiff's claims related to its temporary suspension from CTPAT should also be dismissed because plaintiff has failed to exhaust its administrative remedies. "The doctrine of exhaustion of administrative remedies provides that judicial relief is not available for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Supreme Inc. v. United States*, 892 F.3d 1186, 1192 (Fed. Cir. 2018). In addition to the exhaustion requirements generally applicable to review of federal agency action, this Court has its own

27

"unique exhaustion statute," *Ninestar Corp., v. United States*, 687 F.Supp.3d 1308, 1324 (Ct. Int'l Trade 2024); *see* 28 U.S.C. § 2637(d). That exhaustion statute, which applies in actions like this one brought under 28 U.S.C. § 1581(i), "is not a mere hollow codification of prudential exhaustion," but rather "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Ninestar Corp.*, 687 F. Supp. 3d at 1324 (quoting *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)).

Here, there is not a "strong contrary reason" that the Court should not "insist" that plaintiff exhaust its administrative remedies before CBP. As explained above, CBP must still evaluate whether plaintiff submits a satisfactory remediation plan and determine whether to allow plaintiff to continue its participation in CTPAT. Once such a decision is made, plaintiff will have the opportunity to appeal, at which point CBP will review plaintiff's appeal and issue a final written decision. Indeed, in filings before this Court, plaintiff has acknowledged it has not availed itself of the administrative appeal process. Pl's. Resp. to Chief J. Barnett (ECF No. 23) at 3-4. Plaintiff's action is the type of interim, premature challenge that Congress intended to keep out of this Court when it enacted 28 U.S.C. § 2637(d).

Furthermore, none of the exceptions to required exhaustion under § 2637(d) apply here. *See Ninestar Corp*. 687 F. Supp. 3d at 1326 (noting that "the CIT has not required exhaustion pursuant to § 2637(d) under four circumstances: when (1) plaintiff's argument involves a pure question of law; (2) there is lack of timely access to the confidential record; (3) a judicial decision rendered subsequent to the administrative determination materially affected the issue; or (4) raising the issue at the administrative level would have been futile.") (citations and internal quotation marks omitted).

Plaintiff's claims related to its temporary suspension from CTPAT should therefore be dismissed for this additional reason.

**F.  Plaintiff's Claims Related to Its Temporary Suspension from The ET86 Test Should Be Dismissed Because Plaintiff Does Not Have a Property Interest in Continued Participation in the ET86 Test**

The Court should also dismiss plaintiff's claims related to its temporary suspension from the ET86 Test because plaintiff does not have a property interest in its voluntary participation in the ET86 Test and therefore cannot state a claim under the Due Process Clause of the Fifth Amendment.  "A protected interest must be more than a 'unilateral expectation.'"  *Am. Ass'n of Exp. & Imp.-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1250 (Fed. Cir. 1985) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  Rather, a property interest arises only where one has a "legitimate claim of entitlement" to the benefit.  *Bd. of Regents*, 408 U.S. at 577.  To determine whether a given regime establishes a "legitimate claim of entitlement," courts look to "whether the statutes and regulations governing the distribution of benefits meaningfully channel official discretion by mandating a defined administrative outcome."  *Barrows v. Burwell*, 777 F.3d 106, 114 (2d Cir. 2015) (citation and internal quotation marks omitted).  If not, and the "statute, regulation, or contract in issue vests in the state significant discretion over the continued conferral of a benefit, it will be the rare case that the recipient will be able to establish an entitlement to that benefit."  *Assoc. of Proprietary Coll.'s v. Duncan*, 107 F. Supp.3d 332, 348 (S.D.N.Y. 2015) (citation and internal quotation marks omitted and alteration adopted); *see also Crawford v. Antonio B. Won Pat Int'l Airport Auth.*, 917 F.3d 1081, 1090 (9th Cir. 2019) ("If government officials have the discretion to grant or deny a benefit, that benefit is not a protected property interest.") (citation omitted).

Plaintiff does not have a property interest in participation in the ET86 Test because neither the regulatory authority for CBP to establish the test nor the test's announcement in the Federal Register "meaningfully channel official discretion by mandating a defined administrative outcome." *Barrows*, 777 F.3d at (2d Cir. 2015). As explained above, the ET86 Test is a voluntary test program established by CBP pursuant to 19 C.F.R. § 101.9(a) as a mechanism to beta-test the "effectiveness of new technology or operational procedures." 19 C.F.R. § 101.9(a). Where, as here, "[t]he purpose of a test is to experiment to see if something works," 19 C.F.R. § 101.9(a) envisions broad discretion in CBP's testing authority and grants CBP "the ability to obtain information necessary to predict the effects of various policy options." *See Test Programs*, 60 Fed. Reg. at 14,211-12. And, while the ET86 Test's announcement in the Federal Register encourages the eligible trade community to participate in the test, it maintains CBP's discretion to "remove a filer from further participation . . . based on a determination that that filer's participation in the test poses an unacceptable compliance risk." 89 Fed. Reg. at 2634. In other words, far from containing "explicitly mandatory language" that constitutes "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow," *see Ky. Dep't of Correction v. Thompson*, 490 U.S. 454, 462-63 (1989), the regulatory authorization and announcement of the ET86 Test "vests in [CBP] significant discretion over the continued conferral" of participation in the test, making participation "not a protected property interest." *Assoc. of Proprietary Coll.'s*, 107 F. Supp.3d at 348.

In addition, plaintiff's allegations about the importance of its participation in the test to plaintiff's business because of, *inter alia*, "substantial" investments in software, increased labor costs, or increased reliance on entry type 86 entries, *see* Compl. ¶¶ 34-35, does not transform

participation into a legal entitlement subject to due process protections.  *See Assoc. of Proprietary Coll.s*, 107 F. Supp. 3d at 347 ("Nor does a property interest exist solely because of the importance of the benefit to the recipient.") (citations and internal quotation marks omitted). And, importantly, importers can still avail themselves of the so-called "release from manifest" process which permits consignees to make low-value entries without the use of a customs broker. *See* 19 C.F.R. § 143.26(b).  That voluntary test participants aid CBP in assessing the effectiveness of a new approach for these entries—which would, among other things, include the requirement that consignees use licensed customs brokers for low-value entries—does not create a "legitimate claim of entitlement" to participation in the test for a customs broker.

Accordingly, plaintiff does not have a property interest in its voluntary participation in the ET86 Test and its Due Process claim must therefore be dismissed.

## II.    INJUNCTIVE RELIEF SHOULD BE DENIED

Even if the Court exercises jurisdiction and plaintiff has stated a claim upon which relief can be granted, it should deny plaintiff's request for injunctive relief.  Plaintiff argues it needs injunctive relief "to prevent further suspension of Plaintiff's participation in the T86 and CTPAT programs without identifying the specific underlying facts of the alleged violation(s), leaving Plaintiff without redress to continue a substantial portion of its business."  Pl's. Mot for Prelim. Inj. at 2.  As explained above, plaintiff has (a) been conditionally reinstated into both CTPAT and the ET86 Test, with full benefits of both programs, and (b) been provided "the specific underlying facts" supporting CBP's decision to temporarily suspend plaintiff form participating in CTPAT or the ET86.  Accordingly, plaintiff has no basis for its request for injunctive relief.[16]

---

[16] Plaintiff also seeks an order from this Court that CBP "refrain from making any information concerning alleged violations available to anyone other than Plaintiff or Defendant."  Pl's. Mot for Prelim. Inj. at 1.  While the Government does not agree with Plaintiff as to the scope of the

A.    **Standard of Review**

Injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (citations and quotation marks omitted).  A preliminary injunction is "never awarded as of right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).  To obtain a preliminary injunction, a party must establish each of four elements: "(1) likelihood of success on the merits, (2) irreparable harm absent immediate relief, (3) the balance of interests weighing in favor of relief, and (4) that the injunction serves the public interest." *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018) (citing *Winter*, 555 U.S. at 20).

If a plaintiff "fails to prove any one of these factors, its motion must fail." *Shandong Huarong Gen. Grp. v. United States*, 122 F. Supp. 2d 143, 145 (Ct. Int'l Trade 2000); *see also Winter*, 555 U.S. at 24-33 (denying injunctive relief based on public interest in national security, without considering the other three factors); *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) (citing *Winter* and declining to address other preliminary injunction factors when the plaintiff failed to establish a likelihood of success on the merits); *J. Conrad LTD v. United States*, 457 F. Supp. 3d 1365, 1381 (Ct. Int'l Trade 2020) (citing *Winter* and declining to address other preliminary injunction factors when the plaintiff failed to establish irreparable harm).

As explained below, all four factors weigh strongly against plaintiff's request for injunctive relief.

---

confidentiality of the information, in light of the pending motion and in an abundance of caution, we are redacting all information about SEKO's violations in the public version of this memorandum, and the Government can represent that CBP will not otherwise disclose that information.

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

### B.    Plaintiff Is Not Likely to Succeed on the Merits

As a threshold matter, plaintiff is not likely to succeed on the merits of its claim.  As explained above, plaintiff has already received the relief it has requested from this Court, and therefore, its claims are moot.  In addition, plaintiff has challenged nonfinal, temporary agency actions, a type of challenge which is not permitted by the APA and is not ripe for judicial review. Finally, as described above, plaintiff does not have a property interest in participation in the voluntary ET86 Test that would give rise to Due Process claims, even if it had been deprived of such participation, which it has not been.

Even if this matter is not dismissed, however, plaintiff's request for injunctive relief should be denied because CBP's decision to temporarily suspend plaintiff from both CTPAT and the ET86 Test was neither arbitrary, capricious, or an abuse of discretion[17] nor did it violate plaintiff's due process rights.  First, there is a "rational connection between the facts found [by CBP] and the choice made [to temporarily suspend plaintiff]."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).  CBP, exercising its mandate to monitor compliance with both the ET86 Test and CTPAT, determined

███████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

---

[17] The scope of the Court's review in section 1581(i) actions is limited to the administrative record developed before the agency.  *See Camps v. Pitts*, 411 U.S. 138, 142 (1973).  Should the Court deny defendant's motion to dismiss, defendant will file the administrative record before the Court and reserves the right to more fully address plaintiff's substantive arguments at that time.



██████████        *See* CBP May 20, 2024 ET86 Suspension Letter at 49.  The ████████

████████████████        is not to be discounted.

In addition, plaintiff was on notice that CBP had serious concerns about its compliance

well before CBP temporarily suspended plaintiff from the ET86 Test and CTPAT.  For example,

in its September 29, 2023, letter to plaintiff, CBP identified for plaintiff ████████████

associated with the entries listed in its July 17, 2023 letter and noted that plaintiff had

████████████████████████        CBP Sept. 29 2023 Letter at 32.

Likewise, on January 22, 2024, CBP informed plaintiff of the agency's ongoing concerns

regarding ████████████████████ its Entry Type 86 entries.  CBP Jan.

22, 2024 Letter at 46-47.  And, when CBP ultimately decided to temporarily suspend plaintiff

from CTPAT, it alerted plaintiff in writing to the CTPAT appeal process, confirming that

plaintiff would be afforded a further opportunity to outline its disagreements with the agency (an

opportunity plaintiff decided not to avail itself of).  Pl.'s Resp. to Chief J. Barnett at 3-4.

Accordingly, this factor strongly weighs against granting of injunctive relief.

### C.  Plaintiff Does Not Face Irreparable Harm Absent Injunctive Relief

Plaintiff alleges that it has suffered, and will continue to suffer, irreparable harm from

CBP's temporary suspension based on "loss of goodwill, damage to reputation, and loss

opportunities."  Pl.'s Mot. for Prelim. Inj. at 15-18.  However, plaintiff has failed to establish that

irreparable harm is likely absent injunctive relief.

A plaintiff seeking an injunction bears an "extremely heavy burden" to establish

irreparable injury.  *Shandong*, 122 F. Supp. 2d at 146 (citations omitted).  Critically, "irreparable

harm may not be speculative, . . . or determined by surmise."  *Comm. Overseeing Action for*

*Lumber Int'l Trade Investigations or Negotiations v. United States*, 393 F. Supp. 3d 1271, 1276

34

(Ct. Int'l Trade 2019) (citations omitted).  As the Federal Circuit has explained: "[a] preliminary injunction will not issue simply to prevent a mere possibility of injury, even where prospective injury is great.  A presently existing, actual threat must be shown." *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983) (quoting *S. J. Stile Assoc. Ltd. v. Snyder*, 646 F.2d 522, 525 (C.C.P.A. 1981)).  Thus, courts must deny a preliminary injunction unless the movant demonstrates "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (citations omitted) (emphasis in original).

Here, plaintiff cannot meet its "extremely heavy burden."

First, plaintiff argues that it will suffer irreparable harm because it cannot compete in the marketplace without being able to participate in either CTPAT or the ET86 Test and has been forced to "redesign the Section 321 . . . filing process until its suspension . . . is lifted."  Pl.'s Mot. for Prelim. Inj. at 13-15.  However, plaintiff's "suspension . . . is lifted" because plaintiff has been conditionally reinstated into both CTPAT and the ET86 Test, with full benefits of each program, and provided with the "specific underlying facts of the alleged violations," *id.* at 3, which it claims it needs to develop a remedial plan as required by CBP for continued participation after the conclusion of the conditional reinstatement period.

Second, plaintiff argues that it has devoted investments and labor to allow it to participate in the ET86 Test, all of which is now "in jeopardy."  *Id.* at 16.  Not only does this unquantified and speculative argument fail to account for plaintiff's continued ability to file ET86 entries, but it also assumes plaintiff had a risk-free guarantee when it decided to participate in the ET86 Test.  That suspension from the program based on lack of compliance—as envisioned by the Federal Register notice announcing the test—might put at risk certain investments made by the company

is the type of normal business risk that does not rise to the level of "irreparable harm" requiring injunctive relief.

Finally, plaintiff's argument that it faces irreparable harm in the form of business losses and reputational harm does not warrant injunctive relief. To begin with, plaintiff is currently CTPAT validated and able to file ET86 Test entries and can communicate this fact to current and prospective clients. In addition, plaintiff's oblique references to plaintiff's clients beginning to "question SEKO's trade compliance processes" or the "perception of SEKO as having a weak compliance program," *id.* at 16-17, do not satisfy plaintiff's burden for injunctive relief. *Cf. AVCO Fin. Corp. v. Commodity Futures Trading Comm'n.*, 929 F. Supp. 714, 717 (S.D.N.Y. 1996) (holding in the context of a preliminary injunction motion that the plaintiff's claim loss of business, "skittish" existing users, and an overall "tarnished" reputation was insufficient to establish irreparable injury, noting that for a business whose "practices are investigated, it is a necessary hazard of doing business to be the subject of an inquiry by a government regulatory agency.") (citations omitted). And, crucially, plaintiff is unable to articulate how relief from this Court—let alone injunctive relief—can remedy either past or future reputational harm or business losses associated with CBP's efforts to ensure compliance, particularly in light of CBP's mandate to continually monitor compliance of entities participating in both CTPAT and the ET86 test, none of whom have an unfettered right to such participation.

In sum, nothing in plaintiff's motion suggests that it will face irreparable harm in the absence of injunctive relief, let alone that "irreparable harm is *likely*." *Winter*, 555 U.S. at 22 (emphasis in the original). Accordingly, the irreparable harm factor strongly supports denial of plaintiff's motion.

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

### D.    Public Interest and Balance of Hardships Do Not Support Injunctive Relief

Finally, plaintiff fails to show that its request for a preliminary injunction is supported by the balance of hardships and the public interest, *see Winter*, 555 U.S. at 33, factors that "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, these factors weigh in factor of denying the injunction in this case.  First, there is a strong public interest in ensuring that CBP has the ability to administer programs under its jurisdiction and to monitor and maintain compliance on the parts of program participants.  This is particularly true with respect to the programs at issue, which implicate interests of national security, safety, and the prevention of illicit goods, ███████████████████ from entering the United States.  As mentioned above, Congress established CTPAT "to strengthen and improve the overall security of the international supply chain and United States border security," 6 U.S.C. § 961(a), and explicitly gave CBP the power to deny a CTPAT partner's benefits if the partner's "security measures and supply chain security practices fail to meet any of the requirements" of the program.  6 U.S.C. § 967(a).  Likewise, CBP established the ET86 Test pursuant to its authority under 19 C.F.R § 101.9(a), which allows CBP to create test programs to evaluate the effectiveness of new technology, so long as "collection of the revenue, public health, safety, or law enforcement" are not affected.  19 C.F.R § 101.9(a).  For both CTPAT and the ET86 Test, therefore, there is a strong public interest in allowing CBP to ensure that participants are meeting all necessary compliance requirements.

Finally, the balance of hardships strongly disfavors injunctive relief.  Plaintiff has been conditionally reinstated, with full benefits, and can participate in the programs so long as it continues to engage with the agency in the administrative process toward a successful resolution.  Any monetary or reputational harm suffered by plaintiffs from its brief temporary suspensions

must be weighed against ensuring that the entry of merchandise is done in a manner that protects the public fisc, national security, and public safety. Balancing that concern against plaintiff's asserted financial and reputational harms weighs heavily against imposition of an injunction here.

Because plaintiff fails to establish any of the factors which would support entry of a preliminary injunction, plaintiff's motion should be denied.

## **CONCLUSION**

For these reasons, we respectfully request that the Court dismiss this action or, in the alternative, deny plaintiff's application for a temporary restraining order and motion for preliminary injunction.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

BY:    /s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Edward Kenny
EDWARD KENNY
Senior Trial Counsel

OF COUNSEL:

ALEXANDRA KHREBTUKOVA
JENNIFER PETELLE
ZACHARY SIMMONS
Office of Chief Counsel
U.S. Customs and Border Protection

Dated: July 1, 2024

/s/ Nico Gurian
NICO GURIAN
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-0583 or 9230
*Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Nico Gurian, an attorney in the Office of the Assistant Attorney General, Civil

Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for

the Defendant's motion to dismiss and opposition to plaintiff's application for a temporary

restraining order and motion for preliminary injunction and supporting memorandum, dated July

1, 2024, relying upon the word count feature of the word processing program used to prepare the

memorandum, certify that this memorandum complies with the word count limitation under the

Court's chambers procedures, and contains 12,060 words.


<u>/s/ Nico Gurian</u>